**UNITED STATES of America**

v.

**Richard William BEIDLER.**

**No. 71–129–Cr–J–S.**

United States District Court,
M. D. Florida,
Jacksonville Division.

June 8, 1976.

John L. Briggs, U. S. Atty., Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for the United States.

James L. Harrison, Jacksonville, Fla., for defendant.

Richard William Beidler, pro se.

## ORDER

CHARLES R. SCOTT, District Judge.

This case is presently before the Court on the motion of defendant Richard William Beidler to dismiss the indictment against him. The basis of defendant's motion is that approximately ten years has elapsed since the commission of the alleged criminal offenses and that, therefore, the further prosecution of the case is barred

due to the failure to provide him with a speedy trial. In ruling on the motion, the Court must look at the proceedings against defendant from three perspectives. The first is whether or not defendant's Sixth Amendment right to a speedy trial has been violated. If so, further prosecution is absolutely barred. *Strunk v. United States,* 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973). The second is whether there has been unnecessary delay in bringing this defendant to trial so as to warrant a dismissal with prejudice pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure. The third is whether there has been noncompliance with the speedy trial plans adopted by this Court pursuant to Rule 50(b) of the Federal Rules of Criminal Procedure to such an extent as to warrant dismissal of the action.

It must be conceded that ten years is an extremely long time to delay prosecution. Such a delay is very likely to prejudice the defense of the case. After reviewing all the facts and circumstances surrounding this most unusual case, however, this Court is convinced that further prosecution is not yet prohibited. The motion to dismiss will, therefore, be denied. The reasons for this Court's opinion are set forth below.

The initial indictment against this defendant in Jacksonville, Florida, was returned on October 25, 1966, in Case No. 66–174–Cr–J. The indictment charged defendant with the robbery of three separate banks and with possession of money taken from a bank, knowing the same to have been stolen. 18 U.S.C. §§ 2113(a), 2113(b) and 2113(c).

On October 28, 1966, defendant was arraigned and pled not guilty to the charges. On December 2, 1966, the United States moved the Court, pursuant to 18 U.S.C. § 4244, for a psychiatric examination to determine defendant's competency to stand trial. The motion was granted and the examination was held on December 13, 1966.

On December 21, 1966, Milton Mann, M.D., the examining psychiatrist, reported his findings on defendant's condition to the Court. In accordance with Doctor Mann's recommendations the Court ordered the defendant transferred to the Duval Medical Center, Jacksonville, Florida, for treatment. Defendant received treatment until January 11, 1967, when he was discharged.

Following his discharge, the United States moved for a second psychiatric examination. The basis for the government's motion was that defendant's mental condition while at Duval Medical Center had been "in extremis" and that a second examination was necessary in order to insure defendant's competency to stand trial. The motion was granted and the examination took place on January 18, 1967. Following the examination, on the night of January 18, 1967, defendant attempted suicide. He was then returned to Duval Medical Center.

On January 27, 1967, a hearing was held to determine defendant's competency to stand trial. At that time the Court found "grave doubt" as to the defendant's competency and ordered him sent to the Medical Center for Federal Prisoners at Springfield, Missouri, for further examination. 18 U.S.C. § 4244.

On March 20, 1967, a medical report on defendant's condition was received by the Court from Pasquale J. Cicone, M.D., Director of the Medical Center for Federal Prisoners at Springfield, Missouri. The substance of Doctor Cicone's report was that defendant Beidler was "so mentally ill as to be substantially unable to assist rationally in his defense or to have a rational understanding of the proceedings against him." On the basis of Doctor Cicone's report, another competency hearing was held on April 12, 1967, in this Court. At that time the Court found defendant to be incompetent and unable to assist in his own defense.

By order dated April 14, 1967, the Court ordered defendant committed to the custody of the Attorney General pursuant to 18 U.S.C. § 4246 until he was ready to stand trial or until the charges against him were otherwise discharged. The defendant was then returned to the Medical Center for Federal Prisoners at Springfield, Missouri.

On August 21, 1967, the Court received a further report on the defendant from Doctor Cicone. This report confirmed that as of August 8, 1967, in Doctor Cicone's opinion, "the patient remains grossly psychotic and unable to properly assist in his own defense."

On March 26, 1968, the defendant filed a petition requesting the Court to make a finding that (1) his incompetency was permanent so he could be released to a state institution for treatment, or (2) that his incompetency was temporary so that a definite time for trial could be established. This motion was denied on April 2, 1968.

On May 3, 1968, the Court received a further report from Doctor Cicone. This report was to the effect that as of March 5, 1968, defendant Beidler continued to be incompetent to stand trial. Shortly after this report was received, defendant's counsel in Jacksonville filed another motion for discharge or for further determination with respect to defendant's competency and custody. This motion was also denied by the Court on June 10, 1968.

In March of 1969 the Court requested from the Medical Center for Federal Prisoners an update on defendant Beidler's condition. On March 19, 1969, the Court received a reply from the medical staff at Springfield to the effect that Beidler "remain(ed) psychotic, suffering from schizophrenic reaction, schizo-effective type, with depressive features and pronounced auditory hallucinations." This report also indicated that the prison hospital was exploring the possibilities of having Beidler committed to a state hospital.

On March 10, 1970, pursuant to a petition for writ of habeas corpus, filed by defendant in the United States District Court for the Western District of Missouri, defendant was ordered returned to Jacksonville for a hearing pursuant to 18 U.S.C. § 4246. On March 31, 1970, a hearing was held before this Court. At that time it was represented to the Court that the defendant's sister, Dorothy B. Hoarty, would file a petition for adjudication of incompetency of the defendant in the courts of Duval County, Florida.

It was further represented to the Court by the United States that in the event the defendant was adjudicated incompetent and committed to a state institution, then the government would move for a dismissal of the federal charges against him. Evidence introduced at this hearing included a psychiatric report from the Medical Center for Federal Prisoners dated January 15, 1970, which indicated that defendant Beidler remained incompetent to stand trial.

On April 10, 1970, this Court received a copy of an order entered by the Circuit Court of the Fourth Judicial Circuit of Florida, in and for Duval County, adjudicating defendant Richard William Beidler incompetent. On April 16, 1970, that court ordered defendant Beidler committed to the custody of the Director of Mental Health of the State of Florida. Thereafter, on April 17, 1970, the bank robbery charges in Case No. 66–174–Cr–J were dismissed. At that point all criminal charges against defendant in the United States District Court for the Middle District of Florida were disposed of.

Defendant was released from the Florida Department of Mental Health a few months after his commitment there. The reason for defendant's release so soon after commitment was that the staff of the Department of Mental Health felt that defendant Beidler's treatment would be facilitated by a "home trial visit." Since no charges were pending against defendant, the United States Attorney for the Middle District of Florida was not informed of defendant's release. This knowledge came to the attention of the United States Attorney when it was learned that defendant had been arrested in New Jersey for the alleged robbery of two banks there.

Upon learning of defendant's arrest in New Jersey, the decision was made by the United States Attorney for the Middle District of Florida to reindict defendant for the 1966 Florida bank robberies upon which the statute of limitations had not yet run. This new indictment was returned on July 29, 1971, was designated Case No. 71–129–Cr–J, and charged defendant with violations of 18 U.S.C. §§ 2113(a) and (d).

At the time of the new indictment, defendant was in the custody of officials of the State of New Jersey. For that reason, on August 3, 1971, a request for a detainer was forwarded by the United States Marshal for the Middle District of Florida, Jacksonville, Florida, to the appropriate officials of the State of New Jersey. On August 6, 1971, the detainer was lodged with the Camden County Jail, Camden County, New Jersey, where defendant was incarcerated.

At some point defendant became aware of the new Florida indictment because on October 27, 1971, he wrote to an Assistant United States Attorney in Jacksonville to inquire as to the nature of the Florida charges pending against him. Pursuant to defendant's inquiry, a copy of the new indictment was mailed to him in New Jersey on November 4, 1971.

On November 5, 1971, pursuant to the criminal proceedings in New Jersey, defendant was transferred from the Camden County Jail to the New Jersey Psychiatric Hospital in Mercer County, New Jersey. The Sheriff of Camden County, however, remained the ultimate custodian of defendant, although he was no longer the physical custodian. For this reason it was appropriate that all detainers from other jurisdictions for Mr. Beidler be lodged with the Camden County Sheriff. The Camden County prison records reflect that three such detainers were lodged against Mr. Beidler, one of which was the Florida detainer. When Mr. Beidler was transferred to the New Jersey Psychiatric Hospital, hospital records reflect that the detainers accompanied him.

On July 10, 1972, defendant was discharged from the New Jersey Psychiatric Hospital and returned to the Camden County Jail. Presumably, the reason for defendant's discharge was that his mental condition had improved to such an extent that he was able to face the criminal charges against him in New Jersey. While in the Camden County Jail, however, Mr. Beidler's conduct was apparently inappropriate, because on July 14, 1972, he was returned to the New Jersey Psychiatric Hospital. The hospital records reflect that a notation of the detainers was returned with him to the hospital.

In March 1974 defendant filed a petition for writ of habeas corpus in the state court in Mercer County, New Jersey. Pursuant to the petition, on May 29, 1974, defendant was transferred from the criminal side to the civil side of the psychiatric hospital. Criminal charges against Mr. Beidler in Camden County, New Jersey, were dismissed on July 3, 1974. Further efforts to have the Mercer County court authorize Mr. Beidler's complete release were fruitless, however, because the state court judge would take no further action in Mr. Beidler's case while the Florida charges were pending against him. (See Exhibit 34)

From November 5, 1971, through May 7, 1975, the United States Attorney's Office for the Middle District of Florida, Jacksonville Division, made periodic inquiries of officials of the State of New Jersey as to defendant's status there. Most of these inquiries consisted of letters to the Federal Bureau of Investigation in New Jersey, to the New Jersey Psychiatric Hospital and to the New Jersey Public Defender's Office. A petition for writ of habeas corpus *ad prosequendum* was filed in New Jersey on March 9, 1973, but was not honored. In addition, on May 7, 1975, Assistant United States Attorney Harvey E. Schlesinger wrote a letter to Walter L. Bennett, Jr., Esquire, attorney for defendant Beidler in Charlotte, North Carolina, requesting to be kept informed of any change in Mr. Beidler's status.

On June 12, 1975, defendant Beidler was released from the civil side of the New Jersey Psychiatric Hospital to the custody of his brother in Greensboro, North Carolina. The complete circumstances surrounding Mr. Beidler's release have been, and remain, unexplained. At the time of defendant's discharge, Alois Toegel, M.D., defendant's supervising physician at the hospital, was aware that further charges were pending against Mr. Beidler. He stated, however, that no detainers were reflected

in Beidler's hospital file. Doctor Toegel testified that he could not explain the absence of the detainers in the file.

The Inmate Supervisor at the Camden County Jail testified at a hearing before this Court on March 4, 1976, that when criminal charges against his prisoners are dismissed it is the duty of the Camden County Prosecutor's Office to inform him of that fact. In this case, however, when the charges against defendant Beidler were dismissed on July 3, 1974, the Camden County Jail was never notified. As a result, the supervisor carried Mr. Beidler on his list of inmates at his institution until February 25, 1976, when he was notified by the United States Attorney for the Middle District of Florida that Mr. Beidler was no longer in custody. The supervisor further testified that it is the normal practice of the New Jersey Psychiatric Hospital to notify him when a patient with respect to whom a detainer has been filed has been released from custody. In this case, however, no such notice was forthcoming. The supervisor testified that in his entire seven years at the Camden County Jail never once had the appropriate officials failed to notify him when an inmate was released. It is his opinion that the failure in this instance had nothing to do with the manner in which the detainers were filed but, rather, was the fault of the prosecutor's office and of the hospital in failing to notify him when Mr. Beidler was released. Since the Camden County Jail was not notified of Mr. Beidler's release, and since it was the jail's responsibility to notify all other authorities who had detainers lodged with the Camden County Jail, none of the proper authorities were notified of Mr. Beidler's release.

The record indicates that at the time of his release not only was Mr. Beidler aware of the Florida charges against him, but also Alois Toegel, M.D., Beidler's supervising physician, and Walter H. Bennett, Esquire, Beidler's attorney in North Carolina, were so aware.

On October 29, 1975, four and one-half months after the defendant's release, Deputy United States Marshal Joseph Bennett, stationed in Camden County, New Jersey, in the course of reviewing outstanding detainers, learned that defendant Beidler had been released from the New Jersey Psychiatric Hospital. Deputy Bennett immediately informed the United States Marshal's Office in Jacksonville, Florida, of Mr. Beidler's new status. Upon receiving this information the United States Attorney's Office in Jacksonville, Florida, took immediate steps to obtain custody of the defendant. Defendant was located and arrested in North Carolina on November 21, 1975. He was then released to the custody of his brother, William Beidler. He appeared for arraignment in Case No. 71–129–Cr–J in Jacksonville, Florida, on December 2, 1975. A motion to dismiss the indictment in Case No. 71–129–Cr–J was filed herein on February 17, 1976.

As can be seen from the foregoing facts, the prosecution of defendant has not been a continuous one. From 1966 until the present, for purposes of speedy trial analysis, the prosecution has broken down into roughly three stages. The first stage commenced with the arrest of defendant on October 20, 1966, and ended with dismissal of the first indictment on April 17, 1970. The second stage centered around the reindictment of defendant on July 29, 1971, for the same 1966 robberies. The third stage commenced with the reindictment and continues to the present. Since defendant's right to a speedy trial was not the same at each stage of the prosecution, each stage must be analyzed separately. In each instance, however, the question to be asked is the same. At any point, was defendant denied his right to a speedy trial?

■ The initial prosecution of defendant began with his arrest and indictment in October 1966. His mental competency was called into question on December 2, 1966. He was found to be incompetent to stand trial on April 12, 1967. He remained incompetent until after the charges against him were dismissed on April 17, 1970. During all that time it would not have been possible, consistent with due process, to put the defendant on trial. *Drope v. Missouri*, 420

U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). The delay in the trial made necessary by defendant's mental condition cannot, therefore, be said to infringe upon his right to a speedy trial. *United States v. Mills,* 434 F.2d 226 (8th Cir. 1970); *United States v. Davis,* 365 F.2d 251 (5th Cir. 1966); *Howard v. United States,* 261 F.2d 729 (5th Cir. 1958).

The circumstances under which defendant was detained for three and one-half years awaiting trial raises a separate and unique speedy trial problem. For most of that time defendant was incarcerated at the Medical Center for Federal Prisoners in Springfield, Missouri. He was committed there pursuant to 18 U.S.C. § 4246. That section, which is part of the overall statutory scheme dealing with criminal proceedings against mental defectives, provides for commitment "until the accused shall be mentally competent to stand trial or until the pending charges against him are disposed of according to law." As numerous cases have pointed out, Section 4246 on its face suffers a constitutional deficiency. *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *United States v. Wood,* 469 F.2d 676 (5th Cir. 1972); *Henry v. Ciccone,* 440 F.2d 1052 (8th Cir. 1971); *Drendel v. United States,* 403 F.2d 55 (4th Cir. 1968); *United States v. Curry,* 410 F.2d 1372 (4th Cir. 1969); *United States v. Pardue,* 354 F.Supp. 1377 (Conn.1973); *United States v. Walker,* 335 F.Supp. 705 (N.D.Cal. 1971); *Cook v. Ciccone,* 312 F.Supp. 822 (W.D.Mo.1970); *United States v. Jackson,* 306 F.Supp. 4 (N.D.Cal.1969); *Royal v. Settle,* 192 F.Supp. 176 (W.D.Mo.1959); *Wright v. Steele,* 125 F.Supp. 1 (W.D.Mo.1954).

■ Taken literally, the section provides for the indefinite commitment of an unconvicted mental incompetent merely because criminal charges are pending against him. Since detention at Springfield is considered incarceration, *Williams v. Richardson,* 481 F.2d 358 (8th Cir. 1973), at some point an indefinite commitment there runs afoul of due process, speedy trial and equal protection. To remedy this deficiency, courts have read into the statute a requirement that within a "reasonable time" after commitment, the defendant must be given a hearing to determine his mental status as it relates to the future of the prosecution against him. The United States Court of Appeals for the Fifth Circuit has held that 18 months may be too soon to make such a determination. *Drendel v. United States, supra.* Other courts have held 24 months to be more than a "reasonable time." *United States v. Pardue, supra; United States v. Walker, supra; Royal v. State, supra.*

■ In this case defendant twice moved this Court for a Section 4246 hearing. (April 2, 1968, and June 10, 1968) In both instances the motion was denied. In March 1970 the United States District Court for the Western District of Missouri ordered defendant returned to Jacksonville, Florida, for such a hearing to be held. As a result of that hearing defendant was released to the custody of the State of Florida and federal criminal charges against him were dismissed. Since this is one of the results contemplated at a Section 4246 hearing, it can be said that the matter ended appropriately.

■ The question can be raised, however, as to whether or not defendant's three and one-half years of incarceration prior to the 1970 dismissal resulted in a denial of his right to speedy trial. This Court's research uncovered no case law which would be of guidance in this matter. The cases this Court found dealing with Section 4246 speedy trial problems all involved defendants who were at the time of consideration then incarcerated. In each case where the Court found that speedy trial rights would soon be violated an immediate hearing was ordered. In cases where the Court found that speedy trial had already been violated charges were dismissed. None of those cases, however, dealt with an after-the-fact determination as to be called for in this case. Regardless of this Court's view of the matter, it must be held that defendant's speedy trial rights were not violated by his incarceration at Springfield. The question of the propriety of defendant's continued incarceration under the 1966 indictment

was presented to this Court on three prior occasions and was before the district court in Missouri once. While it cannot be said that any of those courts directly considered the issue, at no time was defendant's speedy trial rights found to have been violated. In 1970 those matters ended appropriately. The question is now moot. *See United States v. Walker, supra.*

■ The second indictment against defendant was returned on July 29, 1971. After review of the facts and circumstances surrounding this second indictment, the Court can see no speedy trial impediment to its further prosecution. The first prosecution against defendant ended with dismissal of the indictment on April 17, 1970. Although the order of dismissal was silent on the matter, it is assumed the dismissal was pursuant to Rule 48 of the Federal Rules of Criminal Procedure. Dismissals under Rule 48 may be on motion of the government with leave of the court (Rule 48[a]) or may be on the court's own motion when there is unnecessary delay in bringing a defendant to trial (Rule 48[b]). In neither case does the motion necessarily involve a determination of defendant's speedy trial rights. *United States v. Clay,* 481 F.2d 133 (7th Cir. 1973); *Cohen v. United States,* 366 F.2d 363 (9th Cir. 1966).

■ In this case the Court's order of April 17, 1970, read in pertinent part, "Upon the motion of the United States . . .." As a general rule, unless a contrary intent is clearly expressed, dismissals under Rule 48(a) are without prejudice to the government's right to reindict for the same offense. *United States v. Ortega-Alvarez,* 506 F.2d 455 (2d Cir. 1974). Since no mention of prejudice was contained in the order, it can be assumed it was without prejudice. While the Court firmly believes this to be the case, the defendant's rights involved here and the unusual facts of the case warrant further examination of the matter.

■ Defendant states that the agreement presented to this Court at the hearing in March 1970 was that if defendant was committed to a state mental institution, then the federal charges against him would be dismissed. Defendant asserts that the agreement was unconditional and did not require that he be detained in the state institution for any particular period of time. Defendant concludes, therefore, that since he was committed to the state institution then the dismissal of federal charges was with prejudice and reindictment was barred. While the Court accepts defendant's statement that no conditions were placed upon his commitment to a state mental institution, the Court does not agree with the conclusion that the second indictment was barred. When the defendant was committed to the state institution the charges against him were dismissed. There are no charges that the dismissal was not in good faith. In addition, it was not defendant's release on a "home trial visit" by itself which triggered the second indictment. Rather, it was his release, which indicated an improved condition, plus the news of the alleged bank robberies in New Jersey, which in combination triggered the second indictment. Other than defendant's assertion that the agreement was unconditional, there is no indication anywhere in the record that the dismissal of the first indictment was to be with prejudice. There is no indication that the dismissal involved any adjudication of defendant's Sixth Amendment speedy trial rights, *United States v. Clay,* 481 F.2d 133 (7th Cir. 1973), and as has been already stated, it cannot be said that the delay in bringing the defendant to trial has been unnecessary. The Court must conclude, therefore, that there was nothing in the proceedings under the first indictment which precludes the bringing of the second indictment.

The 1971 indictment charged defendant with violations of 18 U.S.C. §§ 2113(a) and 2113(d) for the two 1966 robberies on which the statute of limitations had not run. The original indictment had not charged Section 2113(d). The next question to be considered then is whether, apart from the original indictment, there was delay in bringing the 1971 indictment so as to require its dismissal. The law applicable to this question was

announced in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1972).

As *Marion* points out, pre-indictment delay does not impinge Sixth Amendment speedy trial rights. A defendant or potential defendant is protected from pre-indictment delay in the first instances by the applicable statute of limitations. *United States v. Ewell,* 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

In addition, Rule 48(b) of the Federal Rules of Criminal Procedure provides for dismissal if there is unnecessary delay in presenting charges to a grand jury. In this case there was no need to indict defendant until after his arrest in New Jersey. Thereafter, there was no unnecessary delay.

*Marion* also points out that the Due Process Clause of the Fifth Amendment applies to some cases of pre-indictment delay. That clause "would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to [the defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465. In this case there are no allegations of intentional delay. Nor has there been to date a concrete showing of prejudice to the defense caused by the delay.

Nearly five years has passed since defendant's reindictment. He now alleges this post-indictment delay denied him a speedy trial. Questions of post-indictment delay are governed by *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

There is no question that five years is a sufficient period of time to be presumptively prejudicial and to trigger inquiry into the reasons for the delay. In this case, however, defendant was not available for prosecution the entire five years. When indicted, defendant was in the custody of the State of New Jersey. He remained in custody there, in the criminal side of the state mental hospital, almost continuously from November 1971 until April 1974. During that time the office of the United States Attorney for the Middle District of Florida made periodic inquiry into defendant's status. A detainer was filed with the appropriate agency. An effort in March 1973 to obtain custody of defendant through habeas corpus was unsuccessful. The government has the affirmative duty to bring a defendant to trial. In this case, however, it was not unreasonable for the government to expect defendant's status to be slow to change and to expect to be notified promptly when any change occurred. In this regard, then, it cannot be said the government was neglectful of its duty or made insufficient effort to obtain defendant's presence. Although criminal charges against defendant in New Jersey were dismissed in July 1974, it was not until June 12, 1975, when he was released from the mental hospital that he was actually available for trial.

A five and one-half month delay occurred between defendant's release and his arraignment in Jacksonville, Florida, on December 2, 1975. The reason for the delay was that the government was not aware of defendant's release. The system upon which reliance had been placed had failed its function. It is not then a question of deliberate delay or neglect and should not be weighed too heavily against the government. *Barker, supra,* at 531, 92 S.Ct. 2182.

Until recently, defendant never asserted his right to a speedy trial. There is some evidence (See Exhibit 34) that he actually hoped to avoid trial. Upon his release, although aware of the pending charges, defendant made no effort to resolve them. Such action is inconsistent with a desire for a speedy trial.

The question of prejudice to the defendant cannot be fully decided at this time. No doubt defendant has suffered anxiety and concern. He has not, however, suffered oppressive incarceration due to this indictment. To date there has been no showing of actual prejudice to the defense of the case. The Court is aware, however,

that actual prejudice is inherent in a long delay and may manifest itself at trial. If so, the Court will take appropriate action. Until actual prejudice is shown, however, it cannot be said that the post-indictment delay has violated defendant's right to a speedy trial.

 This Court's speedy trial plan, adopted pursuant to Rule 50(b) of the Federal Rules of Criminal Procedure, is not intended as an embodiment of the Sixth Amendment right to speedy trial. It is a regulatory scheme devised by the Court in recognition of the Court's duty to monitor the progress of cases before it. None of the limitations contained in the plan are absolute. Violation of the plan does not require dismissal. Since defendant's arraignment in December 1975 this case has proceeded slowly but deliberately. The slow pace is necessary due to the unusual nature of the case. The Court finds, therefore, that there has been no violation of the Court's speedy trial plan sufficient to warrant dismissal of the case.

After reviewing the proceeding against defendant in its components, the Court must now look at the whole. Ten years has passed since the alleged offenses. For most of that time defendant has been in mental institutions. It is not unlikely that the passage of time has created difficulties for both defendant and the government in this case. Whether these difficulties prevent a fair trial, however, will have to be determined as the difficulties arise.

See Exhibit 34 on page 619.

# EXHIBIT 34

STATE OF NEW JERSEY
DEPARTMENT OF INSTITUTIONS AND AGENCIES
TRENTON PSYCHIATRIC HOSPITAL

Case No. 92,120 Name Richard Beidler Date

SIX MONTH NOTE: 7/29/74: TK/bm: This patient is residing on West 5 and is making a good ward and hospital adjustment. He is cooperative and helpful with the ward chores and presents no problems. He offers no complaints except for back pain and numbness of both arms. Patient requested a consultation with the osteopath and in view of this a neurological consultation was arranged but patient left the area where he was waiting to be seen. Patient was seen by the neurologist on two occasions previously on 5/8/73 and 11/20/73; findings were negative. Patient appears to be in good contact and no hallucinations are elicited. He still maintains the thought that he is being persecuted by some people going into length rationally of his feelings. At the present time his charge in New Jersey has been dismissed but he still has charges pending in Florida and we are in communication with the Assistant U.S. Attorney in Jacksonville, Florida. In terms of disposition, the option of patient being transferred to North Carolina is being considered. The patient's brother is interested in helping him obtain psychiatric care and is willing to cooperate in helping to expedite the question of a transfer. Patient is not participating in Occupational Therapy as he claims he has many reservations and is in fear of injuring or losing his fingers or toes or any part of his body. In view of his good adjustment/we will consider ground privileges in the near future. Medication consists of Thorazine 8 mgs. b.i.d., Serax 30 mgs. b.i.d., Berocca C 1 tablet o.d., and Tylenol 2 tablets q.i.d. prn for pain. PHYSICAL EXAMINATION: Normal healthy male in no acute physical distress. Patient complains of back pain and numbness of both arms. Heart: regular sinus rhythm, no murmurs. Lungs clear to percussion and auscultation.

DIAGNOSIS: Schizophrenia, paranoid type

 T. Krupa, M.D.

COURT HEARING NOTE: 9/25/74: TK/bm: This case was scheduled for a formal court hearing by the Judge Schoch and was dismissed upon review of the legal status by the judge and the patient's council. In conclusion the judge pointed out to the patient that no action can be taken at this time until the charges of Florida authorities are disposed of. Patient expressed his desire to remain in this hospital for the time pending until the legal matters with the Florida Court authorities is resolved.